IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES of AMERICA | : : : | CRIMINAL ACTION |
|---|---|---|
| v. | : : | |
| KEVIN WILLIAM SMALL | : | No. 12-067 |

## MEMORANDUM

Pratter, J.                                                                                                                             April 30, 2013

### INTRODUCTION

Defendant Kevin W. Small presents four pre-trial motions in advance of his trial on charges that he engaged in a criminal conspiracy in violation of 18 U.S.C. § 371, forged signatures of a judge and a court official in violation of 18 U.S.C. § 505, escaped from lawful federal custody in violation of 18 U.S.C. § 751, affixed a counterfeit court seal in violation of 18 U.S.C. § 606, and engaged in mail fraud in violation of 18 U.S.C. § 1341. Specifically, Mr. Small has filed a motion for change of venue, a motion to dismiss the charge of escape, a motion to suppress certain statements made by him to law enforcement personnel at the time of his re-arrest on March 5, 2012, and a request to be transferred to a different detention facility pending trial. (Docket No. 42). The Government opposes all of Mr. Small's applications. For the reasons outlined in this Memorandum the Court denies the motions and the transfer request.

### FACTUAL AND PROCEDURAL BACKGROUND

The roots of this case reach back to federal charges levied against Mr. Small in 2006 when he was charged with four counts of filing false federal tax returns and with mail fraud. *See* Docket 1:06-CR-139. In a February 2007 trial presided over by Federal District Court Judge Christopher C. Conner, a jury convicted Mr. Small on the four tax return counts and acquitted

1

him on the mail fraud count. Judge Conner sentenced Mr. Small to a term of imprisonment of 135 months, payment of $1,000, payment of a $400 special assessment, and a three-year term of supervised release. Judge Conner expressly ordered that this federal sentence of incarceration was to be served consecutively to the state sentence Mr. Small was then already serving. Mr. Small's direct and indirect appeals were unavailing.[1]

Following the October 5, 2007 federal sentencing hearing Mr. Small returned to the Pennsylvania State Correctional Institution at Huntingdon. The Government contends that four days later the U.S. Marshal served the Commonwealth Department of Corrections with a Detainer Based on Federal Judgment and Commitment applicable to Mr. Small. The purpose of the Detainer was to make certain that the Pennsylvania authorities would turn Mr. Small over to federal authorities at the end of his Pennsylvania state sentence.

According to the Government, as outlined in the Indictment for the pending case, in October 2011 the records staff at SCI Huntingdon received through the mail a four-page document, ostensibly from the federal Clerk of Court for the Middle District of Pennsylvania. The document purported to bear the Clerk's signature and directed the entry of an accompanying order, supposedly issued by Judge Conner, which appeared to vacate Mr. Small's federal conviction and sentence and, hence, was to have the effect of discharging the detainer. The Government claims that the papers bore what was to be accepted as Judge Conner's signature and the District Court's official seal. The Commonwealth's prison officials allegedly accepted the papers, so that when Mr. Small completed his state sentence on January 5, 2012 he was

---

[1] The Court of Appeals affirmed Mr. Small's conviction and sentence. *United States v. Small*, 307 Fed. Appx. 703 (3d Cir. 2009). Mr. Small's § 2255 motion was denied on August 9, 2011 and no certificate of appealability issued. Mr. Small appealed that denial and also filed a second § 2255 motion which was also denied and unsuccessfully appealed. Again, a certificate of appealability was refused.

released; he was not relinquished to the federal Bureau of Prisons; and the federal authorities were not informed of Mr. Small's release upon the completion of his state sentence.

In March 2012, by happenstance while working on an unrelated matter, a federal agent who had been engaged in the investigation of Mr. Small's earlier tax charges learned of Mr. Small's release by the Pennsylvania authorities. As a result, federal marshals, FBI personnel and other local law enforcement officers mobilized in order to locate and arrest Mr. Small, which they did on March 5, 2012 at Mr. Small's residence at 5033 Baltimore Street in Philadelphia. The alleged circumstances of that arrest are described below.

Within two weeks of his arrest, the grand jury returned an indictment with four charges against Mr. Small to which he pleaded not guilty at his March 20, 2012 initial appearance. The case, having been initially assigned to the criminal case docket of Judge Conner, was subsequently transferred to the Honorable John E. Jones III, also of the Federal District Court for the Middle District of Pennsylvania. Thereafter, on December 5, 2012, the grand jury returned a superseding indictment which contained the five charges outlined above. Mr. Small again entered not guilty pleas to each count. By January 9, 2013 Mr. Small had filed the motions enumerated at the outset of this Memorandum. While the motions were pending, the Third Circuit Court of Appeals entered an intracircuit transfer order to assign the duties of presiding over this case to the undersigned judge from the Eastern District of Pennsylvania. The case itself remains docketed in the Middle District.

In connection with Mr. Small's suppression motion, this Court then presided over an evidentiary hearing on March 7, 2013 to address the events of the arrest. At that suppression

hearing, testimony was presented by law enforcement personnel Stephen Rowe, John Sermons, Michael Aleman and Gary Duncan. Mr. Small also testified.

Stephen Rowe, an inspector in the U.S. Marshal's Service, testified at the hearing and described his conduct as the lead investigator concerning Mr. Small's current charges. Inspector Rowe testified that he led approximately 10 law enforcement agents to Mr. Small's Philadelphia residence at about 6:45 a.m. on the morning of March 5, 2012. (Hrg. 3/7/13 N.T. at 9; 62). Inspector Rowe and the others who had been deployed to locate Mr. Small were informally dressed. Inspector Rowe followed the others as they forcibly entered Mr. Small's row house. (Hrg. 3/7/13 N.T. at 33; 63; 65). Among those ahead of Mr. Rowe as they entered the Small residence were FBI Agent John Sermons, Deputy Marshal Mike Aleman and Deputy Marshal Duncan, each of whom testified during the hearing. (Hrg. 3/7/13 N.T. at 36; 48; 63).

Once in the house, Inspector Rowe promptly found Mr. Small in the living room, handcuffed and prone on the floor as the earlier entering officers had secured him. (Hrg. 3/7/13 N.T. at 10). Inspector Rowe asked Mr. Small to identify himself. Before finally acknowledging that he was indeed Kevin Small, Mr. Small three times – according to Mr. Rowe – gave a different name. (Hrg. 3/7/13 N.T.at 10-11). At that point, according to Inspector Rowe, once Mr. Small acknowledged his identity *Miranda* warnings were verbally administered while Mr. Small was still in the living room. (Hrg. 3/7/13 N.T.at 10; 25; 38; 44; 57-58; 66-67). According to the witnesses then present, Mr. Small unambiguously acknowledged hearing and understanding the constitutional warnings. (Hrg. 3/7/13 N.T.at 12; 19; 45; 58-59). From the perspective of Inspector Rowe, Mr. Small was an adult of above average intelligence and was conversant with *Miranda* warnings from his prior interaction with the criminal justice system.

(Hrg. 3/7/13 N.T. at 14-15). Thus, as also confirmed by Deputy Marshal Aleman, at the time Mr. Small was informed of his pre-interrogation constitutional rights he (Mr. Small) appeared to fully understand his *Miranda* rights and to be in full control of his faculties. (Hrg. 3/7/13 N.T. at 17-18; 39-40; 47).

While Mr. Small was informed of his rights as he remained handcuffed on the floor, as many as a dozen law enforcement personnel were milling about inside the house. None were pointing any weapon at Mr. Small as he was read his *Miranda* rights,[2] and none were directly physically touching Mr. Small or verbally abusing or threatening him. (Hrg. 3/7/13 N.T. at 18-19; 27-28; 31; 37; 39; 45-47). Soon after the *Miranda* warnings were given, according to Inspector Rowe, Mr. Small said he wanted to use the bathroom. Inspector Rowe, as well as FBI Special Agent John Sermons, walked Mr. Small to the first floor bathroom in the rear of the apartment near the kitchen. (Hrg. 3/7/13 N.T. at 12-13). Thereafter, Inspector Rowe and Mr. Small stepped into the nearby kitchen at which point, according to the inspector, Mr. Small expressed a desire to make a statement. (Hrg. 3/7/13 N.T. at 13; 29). When Inspector Rowe asked Mr. Small how he had come to be released from SCI Huntingdon Mr. Small several times demurred; his response was similar when asked questions about the creation or mailing of the supposed federal order. He did not answer when Inspector Rowe asked about the unserved federal sentence. (Hrg. 3/7/13 N.T. at 13-14).

In response to the inspector's inquiry about the Clerk's Office seal on one of the documents, Inspector Rowe testified that Mr. Small's rejoinder was, "You're not going to find that here." (Hrg. 3/7/13 N.T. at 14). Efforts to glean any more information ceased soon

---

[2] Deputy Marshal Duncan testified that he believes he was the second of the agents to enter the house and at that time had pointed his gun at Mr. Small but had ceased doing so once the warnings were being communicated to Mr. Small. (Hrg. 3/7/13 N.T. at 60; 63).

5

thereafter once Mr. Small began to demonstrate what Inspector Rowe described as "agitation" because Mr. Small wanted to change from his pajamas into street clothes and shoes. According to Inspector Rowe, he told Mr. Small at that point that he (Inspector Rowe) interpreted his (Mr. Small's) conduct as an effort to "deflect the conversation." (Hrg. 3/7/13 N.T. at 14-15). By that point, Inspector Rowe estimates that 10 minutes or less had elapsed since Mr. Small was informed of his constitutional rights. (Hrg. 3/7/13 N.T. at 30). Mr. Small was unharmed, with the single exception of an unexplained cut on his foot. Mr. Small made no claim at the time that he was intimidated by the experience and did not appear to the officers to be intimidated or fearful. (Hrg. 3/7/13 N.T. at 19-21; 32; 41; 69).

Mr. Small also testified at the suppression hearing. He recounted a somewhat different scenario. According to Mr. Small, in the early morning of March 5 he awoke to hear "trampling" on the walkway to his house and was met by between 10 and 15 law enforcement officers when he opened his door. (Hrg. 3/7/13 N.T. at 72-73). Mr. Small recalls being ordered to get down on the floor at which point a "baldheaded white guy came in [and] steps on my head, steps on my body [and] the other one comes over, steps on my ankle, and that's the foot injury . . ." (Hrg. 3/7/13 N.T. at 73-74). Mr. Small identified the offending officers as being "from the Philadelphia team" not the Harrisburg-based law enforcement agents. (Hrg. 3/7/13 N.T. at 73-74). Mr. Small acknowledges that he did not seek medical treatment. (Hrg. 3/7/13 N.T. at 87).

In some respects abandoning the benefits of consistency, Mr. Small claims that he was not informed of his constitutional rights, but takes pains to announce that the "[f]irst thing from [Inspector Rowe's] mouth was *Miranda*." (Hrg. 3/7/13 N.T. at 75-77). He claims that it "never happened" when he was asked if he recalled making a statement to Inspector Rowe at or near the

kitchen after having used the bathroom. (Hrg. 3/7/13 N.T. at 80). He recalls wearing sneakers, pajamas, and a t-shirt on the ride from Philadelphia to Harrisburg. He also recalls being "a little groggy" from lack of sleep on the morning of March 5, but he confirms his age, his experience with and in the criminal justice system and also confirms his understanding of *Miranda* warnings generally. (Hrg. 3/7/13 N.T. at 80; 84-85).

## DISCUSSION

Before addressing the motions that raise procedural, evidentiary or substantive law issues, the Court will address the defense challenge to the Court's *bona fides* in presiding over this case generally or its pendency here in this District, as well as Mr. Small's current custodial concerns.

### A. MAINTENANCE OF THIS CASE IN THE MIDDLE DISTRICT OF PENNSYLVANIA

Initially, Mr. Small urged the recusal of all of the judges of the Middle District of Pennsylvania from presiding over this case, given that at least one of the District's judges, and the District's Clerk of Court, will most certainly be witnesses to be called by the Government. Mr. Small also argued for the wholesale transfer of the case out of the Middle District. Notwithstanding the transfer of responsibility for presiding in this case to a judge from outside the Middle District, Mr. Small persists in citing the "potential for partiality," (Hrg. 3/7/13 N.T. at 97-98), as his reason for pursuing this motion. Specifically, defense counsel advanced his client's argument that "with everything else [being] the same", i.e., the same testimonial and documentary evidence and, presumably, the same jury pool, the recusal and enlistment of a judge from a different district "does not cure the risk that there could be influences...placed upon [the Court] and influence decisions that this [C]ourt makes..." (Hrg. 3/7/13 N.T. at 98). The precise

nature or tenor of the feared "influences" have not been specified. Certainly, the Court is aware of none.

The issues presented by this defense motion for a change of venue are governed by Rule 21(a) and (b) of the Federal Rules of Criminal Procedure. There is no serious dispute that Mr. Small is faced with a heavy burden to justify a change of venue and that the decision is one ultimately left to the sound discretion of the trial court. *See, e.g., Martin v. Warden, Huntingdon State Correctional Inst.*, 653 F.2d 799, 804 (3d Cir. 1981) ("Generally, a motion for a change of venue is addressed to the discretion of the trial court and a refusal to grant such a motion will not be set aside absent an abuse of discretion."); *United States v. Savage*, Crim. Action Nos. 07-550-03 – 07-550-06, 2012 WL 2376680, at *3 (E.D. Pa. June 25, 2012); *United States v. Smith*, No:4:CR-05-0428, 2006 WL 299863, at *1 (M.D. Pa. Feb. 8, 2006).

Likewise, there can be no dispute that Mr. Small supports his motion only with speculation, supposition, and subjective cynicism. Mr. Small presented no evidence of prejudicial taint or pre-trial publicity; no evidence of actual or possible untoward or improper communications concerning the case or any conceivable basis for challenging the propriety of maintaining the current procedural plan for this case; and, hence no basis for the Court's entertaining further this motion for a change of venue which is, therefore, denied.

### B. LOCATION OF MR. SMALL'S PRE-TRIAL DETENTION

Mr. Small objects to the conditions in the Dauphin County prison where he has most recently been detained. He has been held in that facility's restricted housing unit, suffering in what is alleged to be a "deplorable place." (Hrg. 3/7/13 N.T. at 108). He requests the Court's involvement in either rectifying the conditions or ordering his transfer to another detention

facility. Without addressing the efficacy of the allegations made by or on behalf of Mr. Small, the Court has already expressed a disinclination to become embroiled in a prison conditions dispute at this point in the absence of documented facts in what may well be a more far-reaching issue of prison conditions. Instead, the Court again expresses that at present it would be more efficacious for the defense counsel first to reach out to administrators at the Dauphin County prison to ascertain what issues actually pertain to Mr. Small there. The Court also again suggests that counsel contact federal law enforcement and Bureau of Prisons personnel to determine where, and under what conditions, Mr. Small will be held pending his trial in this case. Therefore, Mr. Small's request for a re-location order is denied at this time.

### C. DEFENSE MOTION TO DISMISS THE "ESCAPE" CHARGES OF COUNT 3

Mr. Small moves for dismissal of the charges of Count 3. The premise of the motion is that Mr. Small was not "in custody" of any federal law enforcement body or personnel at the time of the alleged "escape", making it impossible for the Government to prove an essential element of the specific escape offense. As an exercise in logic, the argument could be compelling, but as an evidentiary exercise that must be rooted in reality and common sense it is unavailing.

Mr. Small, while serving a state sentence, was sentenced by Judge Conner to serve 135 months in prison, expressly announced to be consecutive to the state sentence. The mechanics of bringing the federal sentencing judge's intention to fruition fell to the operation of the detainer lodged by the federal marshal with the state correctional authorities. The detainer document called for notice to be given to federal authorities by the state prior to Mr. Small's release from

state custody so that the federal government could "assume custody" of Mr. Small for service of his federal sentence.

In this case, of course, the allegation is that by the creation and use of counterfeit documents bearing a counterfeit court seal and forged signatures, Mr. Small, alone or in concert with others, frustrated the intent of the federal authorities to have Mr. Small released directly to them as he completed service of his state sentence. The Government charges that Mr. Small was, instead, able to evade federal custody at the end of his state sentence, having duped the state officials by way of the false federal paperwork. Mr. Small also advances the scenario that he was released following completion of his state sentence as of 8 a.m. on January 5, 2012 and his federal sentence was to begin at 12:01 a.m. on January 6, 2012.[3]

Thus, in attacking the escape charges, Mr. Small is left to argue either (1) the cause and circumstances of his allegedly ill-gotten release by the state does not matter at all for purposes of this analysis, (2) that "consecutive" does not mean what Judge Conner appeared to intend it to mean so that notwithstanding the detainer there was some kind of timing gap between the end of his state sentence and the start of his federal imprisonment, or (3) that a detainer is an imperfect means for doing what it is plainly intended to do, namely, to make sure a prisoner is held in custody by one authority until transferred to, picked up by and physically in the possession of another.

As for the first option, there is simply no legal, factual, moral or theoretical support for a ruling that would award Mr. Small his freedom as a prize for his own further criminal activity. The imprisonment of prisoners is not relegated to some "catch me if you can / no holds barred" contest. "Escape" is not a defined term in the statute under which Mr. Small is charged, 18

---

[3] In Mr. Small's initial papers different dates were propounded, but Mr. Small subsequently changed the chronology information on this point to the January dates.

U.S.C. § 751. According to the United States Supreme Court, however, to make out such charges the Government is obliged to establish that a defendant "absent[ed]" himself "from custody without permission." *United States v. Bailey*, 444 U.S. 394, 407 (1980). While it remains to be seen if the Government can prove Mr. Small's culpability for Count 3, not even Mr. Small has suggested he actually had "permission" to go on his way once released by the Commonwealth. In any event, the Court will not dismiss the very charges that would be the reason the Government would be trying to make its case in the first place.

With respect to the second option, i.e., supposed definitional difficulty with the word "consecutive" and the timing "gap" proposition, no such gap arises from the evidence here. The Court is confident that the fair and commonly understood meaning of "consecutive" was to convey that that word meant the following of one thing after a predecessor in an uninterrupted sequence. Mr. Small's proposition that there was, by fact or by law, a pre-determined 16-hour hiatus between the end of his state sentence and the start of his federal sentence appears to be nothing more than wishful thinking. Certainly he has cited no case, statute or other authority to conjure up those hours of a supposed "free pass." Stated simply, both the language of Judge Conner's imposition of a consecutive sentence and the pre-printed language of the detainer, together with the apparent fact that the detainer had been properly lodged, provide for the intended seamlessness between the end of the state incarceration and the start of the federal imprisonment. This forecloses the possibility of any actual "gap" through which Mr. Small could wiggle, figuratively or literally.

What then remains is consideration of the role of a detainer itself. The question is whether the lodging of a detainer is the functional equivalent of "custody" so that Mr. Small's

evasion of the intended effect of the detainer amounts to "escape" from federal custody. The Court's short answer is yes.

Mr. Small challenges the efficacy of the detainer in his situation by referencing definitions and uses of detainers in anticipation of trials rather than, as was the case for Mr. Small, in advance of the start of a sentence following conviction. *See e.g., United States v. Esola*, 520 F.2d 830, 838 (3d Cir. 1975); *Ridgeway v. United States*, 558 F.2d 357, 360 (6th Cir. 1977). While it may well be tempting to dismiss such a limited treatment of the use of a detainer as disingenuous, it is not enough to simply reject such a restrictive use as being plainly at odds with the language of the document itself. Moreover, one might well wonder what would be the name of a mechanism law enforcement and penal personnel would use to require notice of the readiness for a transfer of custody of a prisoner from one institution to another if not to call it a "detainer"? Or why would a separately titled notice be necessary or even sensible? It is not and ought not. Mr. Small's description of the role of a detainer is insufficient.

As with the term "escape", the statute does not define the term "custody", leaving the Court to draw upon common sense understanding as used in legal parlance.[4] For purposes of addressing the crime of escape, however, the concept of custody also is viewed through the prism of common sense so that it does not depend upon actual physical control or restraint; like the concept of "possession," it can be constructive. *See, e.g., United States v. Evans*, 159 F.3d 908, 911 (4th Cir. 1998); *United States v. Cluck*, 542 F.2d 728, 731 (8th Cir. 1976). Thus, in

---

[4] The Court acknowledges that often one might not couple "common sense understanding" with "legal parlance." Charles Dickens in *Oliver Twist*, ch. 51, is the favorite source for highlighting that incongruity when his character, Mr. Bumble, responds to being told that the law supposes a wife acts under a husband's direction: "If the law supposes that…the law is an ass – a [sic] idiot. If that's the eye of the law, the law's a bachelor; and the worst I wish the law is, that his eye may be opened by experience – by experience." Fortunately, in this instance, on the matter of understanding the term "custody," the law and the courts have some experience.

*Evans*, "custody" was deemed to include the condition that remains with federal officials even when someone is held in a facility over which federal marshals have no control. In *Evans* a federal prisoner who escaped from a state facility after having been transferred to the state facility by way of a writ of *habeas corpus* was still held to have escaped from federal custody for purposes of 18 U.S.C. § 751.

Other courts have upheld "escape from custody" charges even in circumstances where the "custody" was supported only by a defendant's knowledge of a proper order announcing the imposition of a sentence to commence at a certain time and place. *See, e.g., United States v. Keller*, 912 F.2d 1058 (9th Cir. 1990) (escape conviction upheld where defendant failed to report to designated facility to being serving sentence); *United States v. Peterson*, 592 F.2d 1035 (9th Cir. 1979) (escape conviction affirmed for defendant who left courthouse without permission after judge told defendant he was to begin serving sentence immediately).

In this case, of course, in addition to the lodging of the detainer, Mr. Small was in the courtroom when Judge Conner announced that the 135-month sentence was to be consecutive to his state sentence. There is no suggestion that Mr. Small did not know of this sentence or understand the word "consecutive." Indeed, as the Government suggests in its briefing on the matter, if it develops that there is insufficient evidence presented to establish the elements of the escape charges, the defense can raise it by motion at trial. Likewise, if Count 3 remains in the purview of the jury, the jury can assess any defense that is raised, including if Mr. Small advances an argument premised upon his lack of knowledge, real or imagined. For now, however, the Court is satisfied that ample evidence and case law authority supports the allegation that a federal custodial cloak covered Mr. Small sufficiently to permit the Government to move

ahead with the claim that his failure to be readily and physically available immediately at the end of his state sentence to begin serving his federal sentence as a result of the tendering of the counterfeit documents for which Mr. Small had direct or indirect responsibility violated 18 U.S.C. § 751.

### D. SUPPRESSION OF EVIDENCE

Finally, Mr. Small seeks to suppress from the evidence available to the Government at trial statements he made to Inspector Rowe in the kitchen at his home on the morning of March 5, 2012 (Hrg. 3/7/13 N.T. at 90-91). Mr. Small argues that Inspector Rowe did not give Mr. Small *Miranda* warnings and further that Mr. Small's statements were not voluntary, given that certain of the law enforcement personnel involved in the events of the morning of March 5 at Mr. Small's residence allegedly stepped on him in the course of restraining him. (Hrg. 3/7/13 N.T. at 92).

Suffice it to say, the Court finds more than sufficient evidence from the credible testimony presented by witnesses Rowe, Aleman, Duncan and Sermons to meet the currently demanded preponderance of the evidence standard that *Miranda* warnings were timely given to Mr. Small and were understood by him and that his subsequent statements were not the product of any force, threats, intimidation, or fear on the part of Mr. Small as a by-product of any actual or proposed physical roughness. To be sure, Mr. Small disputed the officers' various testimony that the warnings were provided and from all appearances understood and that no intimidation took place. However, even if the Court credited Mr. Small's rendition of events in terms of the officer's actions, the effect of those actions seems to have amounted to Mr. Small feeling insulted, not intimidated. While Mr. Small repeatedly testified that officers were "stepping on

me like I was some kind of an animal...," (Hrg. 3/7/13 N.T. at 77; 78; 81) and may have even described the alleged potential refusal to allow him to change into street clothes for the ride to Harrisburg as an attempted "threat," (Hrg. 3/7/13 N.T. at 81), Mr. Small's testimony and demeanor while testifying belied any fear or insecurity or lack of appreciation for his rights or his freedom to exercise them. Never did Mr. Small even intimate that he had been fearful, nervous, frightened, or felt threatened. On the contrary, his affect was one of confidence and knowledge about the process in which he was embroiled.

In addition, certain embellishments to Mr. Small's own account of the events that morning in his residence cause the Court to question it. For example, it is hard to accept that under the circumstances of the fast-paced events of the early morning exigent arrival of a dozen or more informally attired officers, some of whom were restraining Mr. Small and others who were searching about his home, that he would know the locale from which particular ones of them hailed. The picture of events as described by Mr. Small from that morning of his arrest suggests the image of as many as a dozen officers, "excited" in Mr. Small's words, milling about in a very small space, some searching the small apartment, some just moving about, entering or exiting the home, all at the same time while Mr. Small is on the floor. How, one might well ask, could Mr. Small know that the officers who touched him were, as he testified, part of a "Philadelphia team" while those who did not lay hands on him were not? (Hrg. 3/7/13 N.T. at 73-75; 77; 80; 83).

Consequently, the Court finds that there is sufficient reason to decline to suppress the statements Mr. Small made to Inspector Rowe on the grounds advanced by Mr. Small, and his motion is denied.

CONCLUSION

For the reasons set forth above, the Court will deny Mr. Small's motion for change of venue, motion to dismiss the charge of escape, motion to suppress certain statements made by Mr. Small to law enforcement personnel on March 5, 2012, and request to be transferred to a different detention facility pending trial. An Order to this effect follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE